

# DIAZ & MOSKOWITZ, PLLC
Attorneys at Law

**John A. Diaz, Esq.**  johnadiazlaw@gmail.com  www.dmlawny.com

Garden City Office:  
1225 Franklin Avenue  
Suite 325  
Garden City, NY 11530  
(516) 686-6444  
(516) 686-6444  

New York Office:  
225 Broadway  
Suite 715  
New York, NY 10007  
(212) 227-8208  
Fax (212) 566-8165

February 15, 2022

**VIA ECF**

The Honorable LeShann DeArcy Hall  
United States District Court  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

                **Re:**    *United States v. Karl Jordan*, **20 Cr. 305 (S-1) (LDH)**

Dear Judge Hall:

      We represent the defendant, Karl Jordan, on the above referenced matter having been appointed pursuant to the provisions of the Criminal Justice Act (CJA). Mr. Jordan has been wrongly charged with the murder of his neighbor and lifelong friend Jason "Jam Master J" Mizell, which occurred when Mr. Jordan was just a teenager. On December 20, 2021, the defense filed an alibi notice with this Court establishing that Mr. Jordan is innocent of this crime. The purpose of this letter is to respectfully move the Court for bail pursuant to 18 U.S.C. § 3142 and Rule 46 of the Federal Rules of Criminal Procedure under the conditions described below, and based on the following reasons.

**A.**    **Introduction**

      Mr. Jordan is 38-years old, and presently before this Court charged in an eleven-count indictment charging him with Conspiracy to Distribute Controlled Substances, in violation of 21 U.S.C. § 841(b)(1)(A) and (b)(1)(C); eight counts of Distribution of Cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(C); Use of Firearms in Connection with a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c); Firearm related Murder, in violation of 18 U.S.C. § 924(j); and Murder while Engaged in Narcotics Trafficking, in violation of 21 U.S.C. § 848(e)(1)(A). Mr. Jordan was arrested on August 17, 2020, and arraigned before Magistrate Judge Lois Bloom. An Order of Detention was entered with leave to reapply to a Magistrate or to a District Court Judge.

Mr. Jordan has been housed at the Metropolitan Detention Center (MDC) in Brooklyn since that date.

As the Court is well aware, we are now living in unprecedented and dangerous times due to COVID-19. This pandemic is lifechanging for all, especially for incarcerated defendants like Mr. Jordan. Prisoners like Mr. Jordan, by the very nature of incarceration, cannot freely decide for themselves how they choose to avoid infection. The jail decides if and when Mr. Jordan will socially distance from others, which correction officers, or other inmates, he will associate with, or whether to associate with them at all and how often to wash his own hands and disinfect his own property. Furthermore, Mr. Jordan is at an elevated risk of complications from COVID-19 as a result of previously donating one of his kidneys to save his mother's life.

By the same token, the very high-risk health crisis caused jail facilities, like the MDC, to implement regulations, like lockdowns, causing limited access to discovery and in person attorney-client access, and erratic remote client access. These major impediments only serve to further cripple defendants, like Mr. Jordan, by depriving them of the ability to effectively engage with their lawyers and other fundamental constitutional rights.

Fortunately, the Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for the preparation of the person's defense or for another compelling reason." *See* 18 U.S.C. § 3142(i). This dangerous, severely contagious, and unprecedented pandemic, in conjunction with Mr. Jordan's personal history and characteristics, are clear and compelling reasons that justify Mr. Jordan's temporary release. Therefore, under both §3142(c) and (i), we respectfully propose that this Court release Mr. Jordan, under our suggested bail conditions, which include 24-hour home detention, electronic monitoring, and a surety bond secured by the signatures of sixteen (16) financially responsible people, and any other conditions the Court may deem appropriate.

As discussed below, Mr. Jordan is not a risk of flight, particularly because he is a lifelong resident of New York City and a father to four daughters. Mr. Jordan does not possess a passport and does not have any contacts or resources outside of the country. Mr. Jordan is also not a danger to the community; while he is charged with death-eligible offenses and a 924(c), the Government has informed counsel that it will not be seeking the death penalty and Mr. Jordan has an alibi for the alleged murder. Nevertheless, should the Court have any concerns of this kind, we propose the following conditions below, which include 24-hour home confinement with electronic monitoring and additional conditions that can reasonably assure Mr. Jordan's return to Court and the safety of the community. Mr. Jordan's family and friends have come together and are prepared to serve as sureties to a $1,000,000.00 (one-million-dollar) bond secured by sixteen (16) financially responsible people. In addition, they have pooled together twenty-thousand dollars ($20,000.00) in cash, along with property owned by his father and grandmother, to serve as collateral, valued at approximately one-hundred and seventy-five-thousand dollars ($175,000.00).

**B.      Background**

This indictment culminates from an 18-year investigation into the murder of Jason Mizell, a/k/a/Jam Master Jay, which occurred in 2002 when Mr. Jordan was only 18 years old. Mr. Jordan's father had been a lifelong friend of Mr. Mizell as the two families lived across the street from each other, and Mr. Jordan considered Mr. Mizell and his family as his own. At the time of the murder, on October 30, 2002, Mr. Jordan was at the home of his then-girlfriend who was pregnant with their daughter at the time.

The murder had gone unsolved since that time despite the hundreds of hours of investigations by local and federal authorities, which included the review of video surveillance and interviewing dozens of witnesses. Mr. Jordan was arrested for this murder on August 16, 2020, twenty (20) months after the release of a self-described "True Crime Documentary" on Netflix that recklessly promoted a theory that Mr. Jordan was one of the two individuals responsible for the murder. During his post-arrest interrogation, Mr. Jordan adamantly denied his involvement in the murder and informed the agents that there were witnesses who could prove he was not there. Accordingly, the defense has filed alibi notice with the Government, which consists of Mr. Jordan's girlfriend at the time, and her mother, a former New York City Correction's Officer and current school teacher.

Since his incarceration on this case in August 2020, the Government has made numerous discovery productions, none of which contain any evidence establishing Mr. Jordan's involvement in the murder of Mr. Mizell, nor his participation in the overall conspiracy that led to the murder. In addition to this paucity of Rule 16 evidence that has been turned over, the Government has also made an unprecedented number of *Brady* disclosures, some of which corroborate Mr. Jordan's alibi, as well as a DNA hit, identifying another suspect, from a hat found at the crime scene. Furthermore, pursuant to a search warrant for Mr. Jordan's DNA authorized by the Court on December 11, 2020, Mr. Jordan was excluded as a contributor to the DNA recovered from the scene of the murder. Finally, on November 6, 2021, the Government filed a letter informing the Court and the defense that the Attorney General would not be seeking the death penalty in this matter.

Since his incarceration on August 17, 2020, Mr. Jordan has endured inhumane prison conditions that rival a modern-day refugee camp. Even under the best of circumstances, inmates' movements are severely restricted at all times and they have little opportunity to participate in social programs, limited access to personal development programs, exercise, physical training or recreation, and almost no opportunities to be outdoors.

The last two years, of course, have presented the worst of conditions. The COVID-19 crisis has hit prisons and jails throughout the country disproportionally to the rest of the country. In response, the BOP has imposed draconian restrictions on inmates. Beginning in March 2020, the BOP implemented phase 2 of its response to the pandemic. Social and legal visits were suspended and inmate movement was restricted. Since that time, Mr. Jordan's unit has often been in lockdown, except for 3 hours a day, with little communication with family.[1] Mr. Jordan has also

---

[1] *See* Kevin Johnson, *Federal prison officials order system-wide lockdown in bid to limit coronavirus spread*, USA Today (Mar. 31, 2020) (available at: https://bit.ly/3erMUHx).

3

had to endure the constant anxiety of catching the coronavirus, knowing he is at an elevated risk of complications as a result of donating one of his kidneys to save his mother.

**C.**     **Discussion**

The Eighth Amendment of the United States Constitution provides that "[e]xcessive bail shall not be required." U.S. Const. amend VIII. The Bail Reform Act of 1984 ensures this principle through 18 U.S.C. § 3142(b), which requires the Court "to order the pre-trial release of a defendant on a personal recognizance bond 'unless the [court] determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community.'" *United States v. Sabhnani*, 493 F.3d 63, 74-75 (2d Cir. 2007) (quoting 18 U.S.C. § 3142(b)). Accordingly, the Bail Reform Act strongly favors pretrial release, and the Court should only detain a defendant in the absence of existing conditions, or a combination of conditions of release, that would reasonably assure the appearance of the defendant as required and prevent danger to the community. *See* 18 U.S.C. § 3142(c)(1). In determining whether such conditions exist, the Court must consider the factors set forth in 18 U.S.C. § 3142(g):

(1)     the nature and circumstances of the offense charged, including whether the offense is a crime of violence…;

(2)     the weight of the evidence against the person;

(3)     the history and characteristics of the person, including –

(A)     the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and [ . . . ]

(4)     the nature and seriousness of the danger to any person that would be posed by the person's release.

Furthermore, if the Court finds that there is probable cause to believe the defendant has committed an offense under section 924(c) or 21 U.S.C. § 841(b)(1)(A), a rebuttable presumption arises that no condition or combination of conditions will reasonably assure the appearance of the defendant and assure the safety of the community. *See* 18 U.S.C. § 3142(e)(3). However, when this rebuttable presumption is triggered, the defendant merely bears the "limited burden of production – not a burden of persuasion – to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2011). In response, the defendant must only introduce "some evidence contrary to the presumed fact in order to rebut the presumption." *United States v. Rodriguez,* 950 F.2d 85, 88 (2d Cir. 1991). When the defendant proffers such evidence, the presumption should be "weighed along with other factors to be considered" in deciding whether to release the defendant. *Id.*

Notably, the Government "retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community," and "by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight." *Mercedes*, 254 F.3d at 436.

**D.      Proposed Bail Package**

Mr. Jordan submits the following bail proposal for Your Honor's consideration. These bail conditions should alleviate any concern the Court may have that Mr. Jordan is a danger to the community or a risk of flight.

1. A one-million-dollar ($1,000,000.00) bond secured by sixteen (16) financially responsible persons; his father's and grandmother's properties located within the state of Georgia which have a fair market value of approximately one-hundred-thousand dollars ($100,00.00) and seventy-five thousand dollars ($75,000.00), respectively, and cash in the amount of twenty-thousand dollars ($20,000.00);
2. 24-hour home detention at Mr. Jordan's residence in Queens, except for necessary medical services, enforced by electronic monitoring, and all other leave from the residence to be submitted through defense counsel for the Court's approval;
3. An inspection of the proposed residence and approval of its suitability by Pretrial Services; and
4. Mr. Jordan shall not have contact with his co-defendant, witnesses, or any alleged victims.

   *1.      Proposed Financially Responsible People*

Counsel has received financial information from sixteen (16) individuals whom are financially responsible people. These individuals consist of Mr. Jordan's immediate family members and lifelong friends who are willing to put their financial futures on the line in order to support Mr. Jordan's innocence. Mr. Jordan's father and maternal grandmother are also prepared to post their properties as collateral, in addition to the family pooling together over twenty-thousand dollars ($20,000.00) to add to Mr. Jordan's bail package. All are ready and willing to co-sign the proposed bond on Mr. Jordan's behalf.

Due to the sensitive and confidential nature of the financial documents received from these individuals, counsel has not included them in this publicly filed submission. However, a copy can be provided to the Government for its review and a copy is available to the Court upon request.

**E.      Mr. Jordan's Background and Characteristics**

Mr. Jordan is 38 years old and the oldest of three children born to Jacqueline Gonzalez and Karl Jordan, Sr. Despite the struggles throughout his life, Mr. Jordan has remained devoted to his mother and his four daughters. In 2010, Mr. Jordan's mother was diagnosed with end-stage renal disease. She immediately began dialysis treatment and was told that she needed a new kidney. Without hesitation, Mr. Jordan volunteered to donate one of his kidneys. While Mr. Jordan was an incompatible donor for his mother, he donated his kidney to another donee so his mother could receive a compatible kidney. His mother underwent a successful kidney transplant and is presently

alive and healthy, all as a result of Mr. Jordan's selfless act, which is evidence of his great character and a person who is devoted to his family and friends.

Mr. Jordan has four daughters, ages 3 to 18 years old. Mr. Jordan is a devoted and supportive father. For example, he would escort his oldest daughter to and from school every day when she was younger and they share an extremely close relationship. Throughout her life, he has encouraged her to achieve and instilled her with confidence. Mr. Jordan's present incarceration has been traumatic for her and all of his daughters

Mr. Jordan is currently in a relationship with a woman who he has two children with, who is also an Acting Deputy Warden for the New York City Department of Corrections. She reports that Mr. Jordan has always been supportive of her ambitions, has allowed her to pursue her dreams and described him as the best father. She also recalled several occasions where Mr. Jordan saved her diabetic brother's life during medical emergencies.

**F.**     **Mr. Jordan's Limited Criminal History**

Mr. Jordan's criminal history consists of one juvenile adjudication and one adult Queens County arrest. He has no adult criminal convictions. Additionally, Mr. Jordan has not engaged in any violent criminal activity while incarcerated.

**G.**     **Mr. Jordan is Not a Danger to the Community**

As mentioned above, Mr. Jordan is not a danger to the community. Although he is charged with death-eligible offenses, the Government has elected not to pursue the death penalty against him. Additionally, Mr. Jordan has two credible witnesses who will testify that he was at their home at the same time as the alleged murder. Notably, one of those witnesses is a former corrections officer.

In addition to the two alibi witnesses, we have received numerous *Brady* disclosures undercutting the prosecution and the discovery produced contains no evidence of Mr. Jordan's involvement in the murder, or the underlying conspiracy. Further, the Government's DNA analysis of the crime scene excluded Mr. Jordan as a contributor. Any potential threat to the community will be eliminated by his 24-hour home detention, enforced with ankle monitoring, a one-million-dollar ($1,000,000.00) bond, secured by sixteen (16) financially responsible people, in addition to the cash and property being offered as collateral.

**H.**     **The COVID-19 Pandemic is a Compelling Reason for Temporary Release under 3582(j) of the Bail Reform Act.**

If the Court does not agree that Mr. Jordan should be released under the proposed conditions pursuant to §3582(e), the Court should temporarily release him under § 3142(i) due to the COVJD-19 pandemic. Section 3882(j) of the Bail Reform Act authorizes that after a defendant has been ordered detained pretrial, a "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of the United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." Mr. Jordan's temporary release is

warranted because his continued pretrial detention poses a heightened risk to his health due to the COVID-19 pandemic and continues to meaningfully affect his ability to meet with counsel and maintain a basic level of effective representation.

As devastating and dangerous as this health crisis is for any individual living freely, it is exponentially more devastating and dangerous for those who are in jail. By all accounts of defense counsel who have spoken to their clients since the pandemic began, jails for the past two years are a terrifying place. A prison doctor's prescient letter to the editor of the LA Times (3/20/20) stated, "Prisons are petri dishes for contagious respiratory illnesses." Also, relevant were the words from Pilar Weiss, the director and founder of the National Bail Fund Network who, when COVID began, was quoted as saying that "the spread inside jails is going to be quick and massive, particularly in areas with limited access to health care facilities from Louisiana to California to New York. We are literally creating tinder boxes of death."[2]

As this Court is well aware, in the SDNY and EDNY, and in many other districts, there is a leaning to "depopulate" the BOP due to this ongoing serious and public health crisis. As the Honorable Jesse Furman stated in the matter of *United States v. Nkanga*, 18-CR-713 (IMF):

> The country faces unprecedented challenges from the novel Coronavirus ("COVID-19") pandemic. Those detained in jails and prisons face particularly grave danger. (Citations omitted). Realistically, the best -perhaps the only - way to mitigate the damage and reduce the death toll is to decrease the jail and prison population by releasing as many people as possible.

18 Cr. 713 (IMF). Additionally, as recently as February 8, 2022, the Honorable Sidney H. Stein cited conditions at the MDC as "exceptional reasons" not to detain a defendant ahead of his sentencing.[3]

---

[2] "Bail Someone Out of Jail Today, https://www.nvtimcs.com/2020104/14/opinion/coro,1avims-jail-bail.html
[3] Tom McParland, *Federal Jail Conditions an 'Exceptional' Reason for Release, US Judge Rules*, NEW YORK LAW JOURNAL, Feb. 8, 2022.

## **CONCLUSION**

For the aforementioned reasons, the Government has failed to show by clear and convincing evidence that Mr. Jordan poses a danger to the community. He has rebutted the presumption in favor of detention as there are available conditions of release that will assure Mr. Jordan's continued appearance before this Court and safeguard the community. Accordingly, the Court should release Mr. Jordan while he awaits trial. The Court's time and consideration of this request is greatly appreciated.

                                  Respectfully submitted,

                                  /s/

                                John A. Diaz, Esq.
                                Michael Hueston, Esq.
                                Mark DeMarco, Esq.
                                Monica Nejathaim, Esq.

*cc:* All Counsel (*via ECF*)