

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MEM/MG
F. #2017R00509

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 18, 2025

By ECF

The Honorable LaShann DeArcy Hall
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Karl Jordan, Jr., et al.
               Criminal Docket No. 20-305 (S-2) (LDH)

Dear Judge DeArcy Hall:

      The government writes in response to the Court's Order dated July 17, 2025, directing the government to provide citations to the record in support of two sentences in the government's opposition to the defendants' post-trial motions, ECF No. 296 ("Govt. Opp."). The government provides a non-exhaustive[1] list of citations below.

A.    **"First, the eyewitnesses had 'no doubt' in their identifications of Jordan and Washington as the perpetrators, which were made in a small, well-lit indoor space from mere feet away." Govt. Opp. 63.**

    i.    **Identifications**

- Tony Rincon
    - Tr. 592:16-18 ("Q: As you sit here, sir, is there any doubt that Karl Jordan shot Jason Mizell? A: No.")
    - Tr. 592:19-21 ("Q: Is there any doubt that Ronald Washington stood at the doorway and yelled at Lydia while that occurred? A: No.")

- Lydia High
    - Tr. 1016:3-6 ("Q: Is there any doubt in your mind that Tinard was the person who pointed the gun at you when you tried to leave the studio? A: No.")

---

[1]    In an effort to better organize the first citation request by the Court, the government has divided it into various categories.

- Tr. 958:8-13 (the shooter was "black," "African-American" and "had a tattoo . . . [o]n his neck")

- Randy Allen
  - Tr. 1074:21-1075:6 (Rincon identified Jordan as the gunman who shot Mizell and Tinard as the other gunman)
  - Tr. 1075:23-1076:5 (High identified Tinard as being in the studio where he put a gun to her and held her on the ground)

- Derrick Parker
  - Tr. 922:23-923:13 (High identified Jordan as the shooter)

- Thomas Lockwood
  - Tr. 330:5-331:3 (High identified Washington in photo array as the person who "pointed a gun at her, told her to get on the ground, while another male shot Jason Mizell")

   ii.   **Close proximity to the perpetrators**

- Physical exhibits
  - GXs 102E (showing the couches and Mizell), 102F (showing the other view of the studio space), 105 (diagram of the studio)

- Tony Rincon
  - Tr. 514:25-515:5 ("Q: When you first saw Little D enter the studio, walk us through what you were able to see? A: I was able to just see him put a hood on. It was kind of him coming straight to Jay. He had to kind of walk around the first – the first sofa there, but, again, it was – it only takes three or four steps to get to that point.")
  - Tr. 516:3-6 ("A: Because I was sitting to [Jay's] right and Jay had stood up. I was still sitting down, and so at that point Little D is in front.")
  - Tr. 519:8-10 ("Q: At the time you heard the two shots, how close in terms of distance were you to Little D? A: The only thing separating the two of us was Jason.")
  - Tr. 519:16-18 ("Q: From your vantage point on the couch, did you have any trouble seeing Tinard? A: No. I had just seen him about a week or so before.")

- Lydia High
  - Tr. 954:24-955:25 (High was sitting "adjacent to" Mizell and Rincon on the couch when "somebody walked in the door. They walked passed me")
  - Tr. 956:3-16 ("Q: What did you do when you heard the gunshots? A: I screamed and I jumped up, I tuned out, and then I ran. I ran to the door. . . Q: What happened when you got to the door? A: I got to the door and the person was standing there. He told me to get down to the ground. Q: Did you recognize the person? A: Yes, I did. Q: Who was the person? A: It was Tinard.")
  - Tr. 958:2-3 ("Q: When he told you to get on the ground, what did you do? A: I got on the ground.")

2

- o Tr. 1011:16-19 ("Q: In order for you to – in order for people to get out of the studio at that point, they had to jump over you because you were on the ground. A: I was on the floor, correct.")

   iii. **<u>The small size of the area where the murder occurred</u>**

- Physical exhibits
  - o GXs 102E, 102F, 105

- Michael Rapley
  - o Tr. 802:20-21 ("Q: Would you describe it as a large or a small studio? A: A small studio.")

- Tony Rincon
  - o Tr. 512:18-513:7 (describing sitting on the sofa next to Mizell when Jordan "walked directly to Jay")
  - o Tr. 514:25-515:5 (referring to Jordan entering the studio and walking around a couch to get to Mizell, "He had to kind of walk around the first – the first sofa there, but, again, it was – it only takes three or four steps to get to that point.")
  - o Tr. 515:13-20 ("Q: When you say he had to walk around the couch a little, can you explain how the couches relate to each other in terms of distance? A: They kind of stagger, but they're diagonal from each other so you have to kind of - - Q: There's not a lot of room in between that space? A: Correct. If somebody is sitting down, you'd have to step over their feet.")

- Lydia High
  - o Tr. 1001:4-19 (referring to GX 105, "Q: Would it be fair to say that from the diagram, as opposed to in the picture, or in reality, that the diagram shows considerably more room between things than actually existed? A: Yes. Q: Is that right? A: Yes. Q: So the sofas are much closer together? A: Yes.")
  - o Tr. 1011:16-19 ("Q: In order for you to – in order for people to get out of the studio at that point, they had to jump over you because you were on the ground. A: I was on the floor, correct.")

   iv. **<u>The lighting at the time of the murder</u>**

- Physical exhibits
  - o GXs 102E, 102F

- Tony Rincon
  - o Tr. 515:9-12 (referring to Jordan, "Q: And when he walked across the room towards Jay, did you have any problem seeing his face? A: No, not at that point. I was just surprised to see his face, period.")
  - o Tr. 522:17-523:3 (referring to GX 102E, "Q: In terms of the lighting in that picture, does that fairly and accurately depict the lighting in that studio? A: Yes. . . Q: Any trouble seeing Jordan at any point? A: No. Q: Any trouble seeing Tinard at any point? A: No.")

3

- Lydia High
    - Tr. 956:15-22 ("A: It was Tinard. Q: Was the person holding a weapon? A: Uh-huh, yes. Q: What kind of weapon? A: It was a gun. Q: Was he pointing it at you? A: Yes.")
    - Tr. 957:23-958:1 ("Q: Did you have any trouble recognizing his face? A: No. Q: You could see him clearly? A: Yes.")

B. **"Second, the narrative provided by both Rincon and High, as well as the physical evidence showing a 'contact shot,' made plain that Mizell knew his killer – he got up to greet the shooter, smiled and gave him an embrace or handshake immediately before the gunshots." Govt. Opp. 63-64.**

- Tony Rincon
    - Tr. 513:1-12 (". . . I see Mr. Jordan come towards Jay and I seen his face before because I seen him a few times and he kind of walked directly to Jay and then almost kind of gave a – like, a potential handshake, almost like a half a handshake with the arm or what have you, and at the same time that's when I hear a shot – a couple of shots . . .")
    - Tr. 516:3-6 ("Because I was sitting to his right and Jay had stood up. I was still sitting down, and so at that point Little D is in front.")
    - Tr. 519:8-10 ("Q: At the time you heard the two shots, how close in terms of distance were you to Little D? A: The only thing separating the two of us was Jason.")

- Lydia High
    - Tr. 953:17-24 ("A: When I walked into the studio, I saw Jay and I saw Tony sitting there on the couch. Q: And you're talking about the couch in front of the television? A: Yes. Q: Where was – which seat in the couch was Tony in? A: Tony was in the far seat by the window and Jay was next to him").
    - Tr. 955:5-8 ("Q: You said that you were sitting down adjacent to him. Do you mean you were sitting on the couch that was across from the couch where Jay and Tony were sitting? A: Correct").
    - Tr. 955:18-25 ("A: . . . I'm looking down, they went over to Jason. And I could see Jason's face and I could see Tony's face, and Jason smiled. He smiled and he kind of gave the person a pound, kind of gave the person a pound, and then he – and then he – and then he. . . And then he said: Oh, shit. Q: What happened after he said that? A: I heard the gun.")
    - Tr. 958:14-19 ("Q: You said that when this person came and greeted Jason before shooting him, he kind of gave him a pound. Do you mean he kind of greeted each other? A: Mm-hm. Q: Did Jason get up off the couch? A: He did. He did.")
    - Tr. 1005:19-25 ("A: The person bent over because Jay was sitting down. Q: Okay. A: So the person bent over and Jay kind of got up a little bit and the person bent over. Q: Okay. Sort of like an embrace? A: Yes.")

- Jeet Bains
    - Tr. 1987:12-1988:6 (referring to the gunshot injuries to Mizell, "Q: And what did your analysis tell you about how many bullets made these two holes? A: One

bullet. And very close. Q: And you said 'very close.' Had are you able to determine the distance between the gunshot hole and the gun? A: Very close means it's a contact shot. And when it's less than about two inches, we call it contact shot. When a gun is fired, if it is closer to the target, like a contact shot, it will create that hole. But as it – if you keep on walking away from that target, the hole will not be damaging hole or ripping and tearing. Q: And so was this a contact shot? A: Yes. Q: And so your analysis determined that the distance was less than two-inches? A: That's correct.").
- Tr. 1988:19-21 (referring to the hole in Rincon's pants, "Q: And if this hole had been created by a gunshot, what would be the distance of the hole from the gun? A: I can't say exactly, but it is couple of feet away").

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: _____/s/_____
Mark E. Misorek
Miranda Gonzalez
Assistant U.S. Attorneys
(718) 254-7000

cc: Court of Clerk (LDH)
Defense counsel of record