UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                         Government,

          v.

KARL JORDAN, JR., and RONALD
WASHINGTON,

                   Defendants.

**MEMORANDUM AND ORDER**

20-CR-305-LDH-1

---

LASHANN DEARCY HALL, United States District Judge:

Karl Jordan, Jr. ("Jordan") was charged in a superseding indictment with eleven (11) counts. (Superseding Indictment, ECF No. 151.) The Court severed Counts Three through Eleven of the indictment. The remaining two (2) counts of the indictment—Counts One and Two—charged Jordan, Ronald Washington ("Washington"), and Jay Bryant with murder while engaged in narcotics trafficking, in violation of 21 U.S.C. § 848(e)(1)(A), and firearm-related murder, in violation of 18 U.S.C. § 924(j). (*Id.* at ¶¶ 1, 2.) Jordan pleaded not guilty to each count. The Court subsequently severed Jordan and Washington's trial on Counts One and Two from the trial of Jay Bryant on each count.

The Court held a jury trial as to Jordan and Washington commencing January 29, 2024. At the close of the Government's case, Jordan moved for judgment of acquittal, pursuant to Rule 29(b) of the Federal Rules of Criminal Procedure. The motion was denied. On February 27, 2024, the jury returned a verdict of guilty on each count. Jordan renews his motion for judgment of acquittal, pursuant to Rule 29(b) of the Federal Rules of Criminal Procedure, and, in the alternative, moves for a new trial, pursuant to Rule 33(a) of the Federal Rules of Criminal

Procedure.  (*See* Def.'s Mem. L. Supp. Mot. J. Acquittal and Mot. New Trial ("Def.'s Mem."),

ECF No. 293.)

## BACKGROUND

Jason Mizell, also known as Jam Master Jay, was a disk jockey and music producer who,

in the 1980s, garnered wide acclaim for his musical successes with the hip-hop group "Run

DMC."  As the spotlight on Run DMC dimmed in the 1990s and Mizell's musical career

sputtered, he entered the cocaine distribution business to offset his financial losses.  (Tr. 1051:5–

13, 888:10–13.)  According to one of Mizell's friends, Eric James, Mizell's role in the drug trade

was to act as a middleman:  He obtained cocaine on consignment from his supplier, a man called

Unc, then distributed it to others to sell.  (*Id.* at 1751:17–20, 1752:2–12.)  James, himself, was

selling cocaine in the Midwest at the time he met Mizell in the 1980s.  (*Id.* at 1749:13–1751:12,

1751:17–20.)

In 2001 or 2002, Jordan,[1] Mizell's godson, asked James about the price of cocaine.  (*Id.*

at 1755:16–1756:13, 1756:10–13.)  Jordan asked James to tell Mizell to "put [him] on," which

James understood to mean to give Jordan cocaine to sell.  (*Id.* at 1756:24–1757:10.)  Later,

Mizell told James that he gave Jordan an ounce of cocaine to "try him out," and that Jordan sold

it successfully.  (*Id.* at 1768:6–1770:2.)  Separately, in early 2002, Mizell provided Washington,[2]

a lifelong friend, with cocaine to sell.  (*Id.* at 1767:7–1768:1.)  Mizell informed James that

Washington "messed it up."  (*Id.* at 1767:7–1768:1, 1812:17–24.)

Also in 2002, Mizell "had a line" on 100 kilograms of cocaine from Unc.  (*Id.* at 1770:7–

15.)  However, at the time, Mizell only received ten kilograms from him due to a supply

---

[1] At trial, Jordan was also referred to as "Little D" and "Noid."

[2] At trial, Washington was also referred to as "Tinard."

shortage.  (*Id.* at 1770:7–22.)  Mizell told James that he would "set up shop" with Jordan and

Washington, to distribute those ten kilograms in Baltimore.  (*Id.* at 1760:8–14, 1770:6–22,

1771:1–8.)  In addition, Mizell stated that he could make more money in Baltimore due to his

relationship with Yakim,[3] a childhood friend who resided in Baltimore and previously sold

cocaine for Mizell.  (*Id.* at 888:10–13, 1770:6–1772:2, 1776:2–1777:4.)  Mizell discussed this

Baltimore deal with James "maybe six, seven" times.  (*Id.* at 1777:13–16.)  And, James testified

that, based on these conversations, he understood that the Baltimore deal was supposed to be an

"ongoing" distribution arrangement.  (*Id.* at 1777:17–20.)  Yakim, however, was unable to recall

at trial whether the Baltimore deal was meant to be one-time or ongoing.  (*Id*. at 886:4–5.)

In August of 2002, Chris Burrell, a friend of Mizell, drove Mizell and Washington to

Washington, D.C., ostensibly for the purpose of bringing jewelry to Unc.  (*Id.* at 1228:16–

1229:4, 1229:12–20.)  Washington later admitted to law enforcement that the purpose of this

meeting was to pick up cocaine from Unc.  (*Id.* at 1616:23–1618:4, 2087:21–2088:14.)  Jordan

did not travel to Washington, D.C., with Mizell and Washington.  (*See id.* at 1228:16–21.)  Prior

to the meeting, Washington advised Mizell that they should acquire the cocaine at $18,000 per

kilogram.  (*Id.* at 2088:19–2089:9.)  After discussing the terms with Unc, Mizell left the meeting

with the cocaine in his possession.  (*Id.*)  According to Washington, this quantity of drugs was

worth $120,000.  (*Id.* at 1617:2–1618:4.)

Mizell and Washington traveled to Baltimore the following day.  (*Id.* at 1233:2–4.)

During the drive, Mizell and Washington discussed the possibility that Washington would stay in

Baltimore to sell cocaine.  (*Id.* at 1233:2–24.)  Upon arrival, Mizell met with Yakim to discuss

his plan to "move"—that is, sell—cocaine in Baltimore.  (*Id.* at 885:3–10.)  During this

---

[3] At trial, Yakim was also referred to as "Ralph Mullgrav" or "Mr. Mullgrav."

conversation, Mizell explained that he wanted Yakim to move between ten and twenty kilograms of cocaine, for an amount between $15,000 and $20,000 per kilogram. (*Id.* at 885:3–21, 890:15–21.) Moreover, Mizell sought permission for Washington to remain in Baltimore to sell the cocaine. (*Id.* at 894:2–4.) Because of animosity between Yakim and Washington, Yakim said, "No" deal, and threatened to kill Washington. (*Id.* at 886:8–10, 1237:3–12; *see also id.* at 893:25–894:8 (Q[:] And during [the summer of 2002], Mizell visited you, right? A[:] Yes. Q[:] And he came to you for permission to put Tinard in Baltimore; am I right? A[:] Yes. Q[:] And you said no, right? A[:] Yes. Q[:] So no deal, right? A[:] No deal.").) Following this meeting, Washington returned to New York with Burrell. (*Id.* at 1237:10–1238:13.) Mizell stayed in Baltimore to negotiate the terms of the deal with Yakim. (*Id.* at 886:18–887:3.)

Mizell returned to Hollis, Queens, on October 29, 2002, (*id.* at 611:7–10), with plans to travel on October 31, 2002, to deejay as part of a local music group called Rusty Waters. (*Id.* at 1061:10–20.) Concurrently, Mizell had plans to meet with Unc's associates. (*Id.* at 1618:5–8.) The meeting was scheduled to take place on either the day of or before Mizell's death. (*Id.* at 1618:5–12.) On October 30, 2002, Washington and his girlfriend, Daynia McDonald, went to Mizell's studio (the "Studio"), where they met Mizell, who appeared surprised to see Washington. (*Id.* at 1477:16–22, 1548:23–1549:3.) Washington noticed that Mizell had a firearm and asked him why he needed the gun, before reminding Mizell, "If you have a problem, I have a problem too." (*Id.* at 1477:23–1478:2, 1550:16–1551:7.) While at the studio, Washington also asked Mizell if the two were going to a show in Connecticut and asked about Baltimore. (*Id.* at 1478:11–20.)[4] At some point, McDonald and Washington left the Studio, and

---

[4] Washington had not previously discussed touring with Mizell, (*id.* at 1478:21–24), and, by all accounts, was not otherwise involved in Mizell's music, (*id.* at 519:19–23, 823:13–18, 1056:25–1057:3).

Washington took a call from an unnamed individual. (*Id.* at 1480:1–1482:3.) Thereafter, Washington directed McDonald not to return to the Studio. (*Id.*)

Later that night, Mizell was shot and killed in the Studio. (*See, e.g.*, *id.* at 140:16–18; 2089:25–2090:2.) In addition to Mizell, there were five other individuals in the Studio: Randy Allen, Yarrah Concepcion, and Mike Rapley, all of whom were in the control room, (*id.* at 779:23–782:15); and Uriel "Tony" Rincon and Lydia High, who were eyewitnesses to Mizell's murder, (*id.* at 514:24–516:23, 955:20–956:5).

Rincon knew Jordan and Washington prior to the murder, having interacted with each of them inside and outside of the Studio. (*Id.* at 518:1–521:11.) Rincon identified Jordan as the individual who fired the fatal shot. (*Id.* at 513:4–18.) He described having a clear view of Jordan's face and part of his neck tattoo during the brief altercation, in which Jordan approached Mizell for an "embrace," after which Rincon heard "two gunshots," felt a shot to his "left leg above the knee," and saw Mizell fall to the floor. (*Id.* at 514:24–517:2.) Rincon testified further that, at the same time of the shooting, Washington was standing at the door of the Studio and told Lydia High to get down on the ground. (*Id.* at 513:13–19.) Rincon also testified that, days after the murder, he confided in Allen that Jordan and Washington were the perpetrators. (*Id.* at 525:17–25.) This statement was corroborated by Allen's testimony. (*Id.* at 1074:19–1075:6.)

Lydia High testified that she saw a "fair-skinned . . . African-American" man with a neck tattoo give Mizell "a pound," at which point she heard Mizell say, "Oh, shit," and heard a gun fire. (*Id.* at 955:20–958:17.) High attempted to escape the Studio but was stopped by Washington, who ordered her to the ground at gunpoint. (*Id.* at 956:3–22.) High and Washington grew up on the same block during their childhood, and she testified that she saw him clearly and had no doubt that he was the one who pointed the gun at her as she tried to leave the

5

Studio.  (*Id.* at 957:3–9, 957:23–958:1.)  The day after the shooting, High also told Allen that Washington ordered her to the ground at gunpoint.  (*Id.* at 1075:23–1076:5.)  And, although High testified that she could not recall whether she previously provided the police with a description of Jordan's neck tattoo, (*id.* at 961:15–969:17, 980:1–982:5), Allen testified that, the day after the shooting, High told him that the shooter had a neck tattoo, (*id.* at 1075:23–25, 1076:9–14).  High's bodyguard, Derrick Parker, provided additional testimony that, in November 2002, High identified both Jordan and Washington as the perpetrators.  (*Id.* at 920:8–921:5, 923:3–9.)

Tanya Davis, an employee of a financial services company located in the same building as the Studio, testified that she saw a "very tall[,] . . . lanky . . . black" man with "light skin," a "shadow beard," and "braids" enter the front door of the building and walk back towards the Studio shortly before the shooting.  (*Id.* at 1313:10–1314:19.)  She later saw the same man exit through the front door after the shooting.  (*Id.* at 1317:3–1318:10.)  It is uncontested that Jay Bryant, an alleged accomplice to the killing, was at the scene at the time of the murder.

Other witnesses testified that Jordan admitted his involvement.  Cherubin Bastien, a man who rented a room in Jordan's home, testified that, while driving Jordan and his friends around in 2004, he overhead a conversation about "Jam Master Jay," in which Jordan, referring to Mizell, stated, "[I]f I get to kill him, I'll kill him again."  (*Id.* at 1840:24–1842:24, 1845:25–1846:14.)  Bastien also recalled a second conversation in which Jordan was arguing with a woman at their shared residence.  (*Id.* at 1847:16–1848:3.)  In this conversation, Bastien overheard Jordan tell the woman that he would "do [her] exactly just like [Mizell]."  (*Id.* at 1848:1.)

Jay Bryant's uncle, Raymond Bryant, testified that Jay Bryant is between 6'4" and 6'5" and walked with a limp. (*Id.* at 1349:1–21.) Raymond Bryant also testified about two conversations that he had with Jay Bryant related to the murder. In the first conversation, which occurred around 2003 or 2004, Jay Bryant admitted that he "did it" because Mizell went for his gun. (*Id.* at 1374:15–1375:2.) In the second conversation, Jay Bryant relayed that his hat had been found at the crime scene. (*Id.* at 1378:10–15.) That hat contained Jay Bryant's DNA. (*Id.* at 1378:16–18.)

## DISCUSSION

## I.    Rule 29:  Motion for Judgment of Acquittal

A defendant challenging a jury's guilty verdict "bears a heavy burden," *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (citation omitted). Indeed, the standard of review has been described as "exceedingly deferential." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (citation omitted). As such, in considering a motion for judgment of acquittal, the court must view the evidence in the light most favorable to the Government, *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003), "crediting every inference that could have been drawn in the [G]overnment's favor," *Martoma*, 894 F.3d at 72. Most fundamentally, when considering a Rule 29 motion, "courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *Jackson*, 335 F.3d at 180. That is, the "resolution of the weight of the evidence and the credibility of the witnesses" are "the province of the jury and not of the court." *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) (citations omitted). Notably, "[a] 'jury's verdict may be based entirely on circumstantial evidence.'" *United States v. Berry*, No. 20-CR-84 (AJN), 2022 WL 1515397, at *4 (S.D.N.Y. May 13, 2022) (quoting *United States v. Sureff*, 15 F.3d 225, 228 (2d Cir. 1994)). "[S]o long as . . . inference[s are] reasonable, 'it is the

task of the jury, not the court, to choose among competing inferences.'" *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008). Accordingly, a Rule 29 motion may be granted "only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States v. Guadagna*, 183 F.3d 122, 129–30 (2d Cir. 1999) (citation omitted). It is against this legal backdrop that the Court reviews Jordan's Rule 29 motion.

### A.    Count One

#### 1.    Membership in the Drug Conspiracy

Pursuant to Count One, Jordan was charged with violating 21 U.S.C. § 848(e)(1)(A), which makes it unlawful for anyone who, while "engaging in" a qualifying drug offense, "intentionally kills, or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results." (Superseding Indictment ¶ 1.) In this case, the qualifying drug offense was "a conspiracy to distribute five kilograms or more of a mixture or substance containing cocaine." (*Id.*) Therefore, to meet its burden as to Count One, the Government was required to prove, among other things, that Jordan participated in the charged drug trafficking conspiracy. *See United States v. Desinor*, 525 F. 3d 193, 202 (2d Cir. 2008) (noting as an element of 21 U.S.C. § 848(e)(1)(A) that the conspiracy was ongoing when the killing occurred). It did.

As set forth in the charge to the jury, to find that a conspiracy existed, the evidence needed to show that "at least two people joined together in a common criminal scheme . . . [and] participated . . . willfully and with knowledge of its unlawful purpose and in furtherance of its unlawful purpose." (Tr. 2543:21–22, 2545:3–6.) *See also United States v. Chavez*, 549 F.3d 119, 125 (2d Cir. 2008) ("In order to prove a single conspiracy, the government must show that

each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." (citation omitted)).  Here, Jordan concedes that the Government proved he agreed to enter a conspiracy to traffic in cocaine.  That is, according to Jordan, there is "no evidence that Mizell conspired with Jordan to sell drugs *apart from* the Baltimore deal or New York . . . . " (Def.'s Mem. at 18 (emphasis added).)  By Jordan's own admission, then, he joined Mizell in a drug trafficking conspiracy as early as 2001, when he sold an ounce of cocaine on Mizell's behalf in New York.  (*See id.* at 3, 18; *see also* Tr. 1755:12–1757:7, 1769:18–22.)  The trial testimony supports this conclusion; James testified that Jordan inquired about cocaine prices, requested that Mizell "put him on," and even sold some quantity—albeit small—of cocaine.  (*See* Tr. 1756:24–1757:10).

Nonetheless, Jordan contends that Yakim's refusal to work with Washington in Baltimore "ended" the "Baltimore scheme" and that the Government failed to adduce any evidence from which a jury could reasonably infer that he joined, or had knowledge of, any new scheme. (Def.'s Mem. at 18–22.)  And, as Jordan's argument goes, because there was no evidence of conspiratorial conduct after Yakim "said, 'No deal,'" there was no ongoing conspiracy when Mizell was murdered months later.  (*Id.*)  Not so.

As a threshold matter, and as the Government aptly argues, there was only one overarching drug conspiracy, which Mizell conducted in New York and sought to expand to Baltimore.  (Gov't's Mem. L. Opp'n Defs.' Mot. Acquit. and Mot. New Trial ("Gov't's Opp'n") at 39–44, ECF No. 296.)  There were not, as Jordan contends, separate conspiracies.  (Def.'s Mem. at 18–22.)  Indeed, in advance of trial, Jordan proposed that a multiple conspiracies jury instruction be included in the final charge, "if applicable."[5]  (Joint Def. Reqs. Charge at 24.)

---

[5] Jordan and Washington submitted a joint jury charge, which proposed the following instruction as to multiple conspiracies:

However, at the charging conference, Jordan failed to argue for the instruction's inclusion or object to its omission from the final charge.  Presumably, Jordan's failure to argue for a multiple conspiracies jury instruction resulted from his determination that, based on the trial record, there was no basis to advance such an argument.

In any event, Jordan's argument that the charged drug conspiracy ended when Yakim said, "No" deal, is unconvincing.  It is plain from the evidence that Yakim's refusal to work with Washington does not preclude the conclusion that the drug conspiracy was ongoing or that Jordan was a member.  Yakim's refusal was clearly limited to Washington.  (Tr. 886:8–10, 893:25–894:8.)  There was simply no evidence that Jordan's participation in the conspiracy depended on Washington's role in Baltimore, that he lacked the ability to distribute narcotics in

---

**Request No 18:  Defenses:  Multiple Conspiracies [If Applicable]**

In this case, the defendants contend that the government's proof as to Count [##] fails to show the existence of only one overall conspiracy. Rather, they claim that there was actually a separate and independent conspiracy involving themselves and other persons.

Whether there existed a single unlawful agreement or many such agreements, or indeed, no agreement at all is a question of fact for you the jury to determine in accordance with the instructions I am about to give you.

When two or more people join together to further one common unlawful design or purpose a single conspiracy exists. By way of contrast, multiple conspiracies exist when there are separate unlawful agreements to achieve distinct purposes.

If you find that the conspiracy charged in the indictment did not exist, you cannot find either defendant guilty of the single conspiracy charged in the indictment. This is so even if you find that some conspiracy other than the one charged in this indictment existed, even though the purposes of both conspiracies may have been the same and even though there may have been some overlap in membership.

Similarly, if you find that the defendant you are considering was a member of another conspiracy and not the one charged in the indictment, then you must acquit that defendant of the conspiracy charges. Therefore, what you must do is determine whether the conspiracies charged in the indictment existed. If they did, you must then determine the nature of the conspiracy and who were its members.

(Joint Def. Reqs. Charge at 24, ECF No. 204.)

Baltimore, or that his involvement in the drug conspiracy was contingent on the success of the
Baltimore deal.[6]

Equally unavailing is Jordan's contention that there was no evidence of conspiratorial
conduct after Yakim "said, 'No deal,'" and that, therefore, there was no ongoing conspiracy
when Mizell was murdered.  (Def.'s Mem. at 18–22.)  In fact, there was ample evidence of
conspiratorial conduct after Yakim said, "No" deal.  There was testimony that Mizell:  remained
in Baltimore to negotiate with Yakim, (Tr. 886:18–887:3, 1237:10–1238:10); "had a line" on 100
kilograms of cocaine, which was to be sold on consignment, (*id.* at 1770:13–14; *see id.* at
1794:24–1795:6); intended distribution of the cocaine to be "ongoing," (*id.* at 1777:13–20); and
had not paid Unc for any of the cocaine as of October 2002, (*see* Tr. 1788:11–20 ("Q[:]  Did you
ever speak with Unc after [Mizell's] murder? . . . A[:]  Yes . . . . Q[:]  Did [Unc] say anything
about money? A[:]  He said – he said whatever [Mizell] owed died with him.").  This evidence
sufficiently established an ongoing conspiracy to distribute narcotics.  Indeed, the fact that
Mizell sold drugs on consignment is, alone, sufficient to allow the inference that the conspiracy
did not end in Baltimore.  *See, e.g.*, *United States v. Brock*, 789 F.3d 60, 64 (2d Cir. 2015)
(collecting cases where "significant indicia of a conspiratorial purpose existed:  the defendants
purchased drugs in significant quantities on credit from the selling organization and took
substantial other steps to assist it such as facilitating resales, supplying bail money and recruiting
other customers and sellers."); *United States v. Glynn*, 686 F. App'x 51, 54 (2d Cir. 2017)
(purchase of drugs on credit for redistribution showed conspiratorial relationship); *United States
v. Faltine*, No. 13-CR-315 (KAM), 2016 WL 1700385, at *4 (E.D.N.Y. Apr. 26, 2016) (drug
sales on consignment "is a stand-alone factor supporting a conspiracy").  That the cocaine was

---

[6] As discussed, *infra*, the Government makes this very argument.

not ultimately distributed by Mizell in Baltimore is of no consequence. As the Second Circuit has recognized, "the absence of an actual sale or seizure of narcotics does not render insufficient the proof of a conspiracy to distribute it." *Santos*, 541 F.3d at 71.

Certainly, it was theoretically possible for the conspiracy to have continued without Jordan. However, once an individual enters a conspiracy, the only way to exit it is for him to affirmatively withdraw from it. *United States v. Leslie*, 658 F.3d 140, 143 (2d Cir. 2011) (citation omitted). To withdraw, a defendant must "show that he performed some act that affirmatively established that he disavowed his criminal association with the conspiracy." *United States v. Eppolito*, 543 F.3d 25, 49 (2d Cir. 2008) (cleaned up). Here, Jordan fails to argue—let alone direct the Court to evidence—that he took any affirmative step to withdraw from the charged drug conspiracy. Given the trial evidence, Jordan's concession that he entered into the conspiracy, and Jordan's failure to demonstrate his withdrawal from the conspiracy, the Court concludes that Jordan was a member of a drug trafficking conspiracy at the time of Mizell's murder. This conclusion does not end the Court's inquiry, however.

### 1.    Proof of Drug-Related Motive

In assessing the sufficiency of a conviction under § 848(e)(1)(A), "[c]ourts [have] universally concluded that a substantive . . . connection" between the killing and continuing criminal enterprise is required to sustain a conviction. *U.S. v. Aguilar*, 585 F.3d 652, 658 (2d Cir. 2009) (collecting cases). Therefore, in addition to proving Jordan's participation in the drug trafficking conspiracy, to meet its burden as to Count One, the Government was required to satisfy what is known as a nexus requirement. 21 U.S.C. § 848(e)(1)(A).[7] Here, the Government

---

[7] Jordan contends that, with respect to § 848(e), the Government was required to show that "Mizell's murder furthered the conspiracy's goals." (Def.'s Mem. at 23.) As support for this contention, Jordan relies on the legal standard for a violation of 18 U.S.C. § 1959, which requires the Government to show, *inter alia*: the existence of an enterprise engaged in racketeering; the defendant's attempt to obtain a position therein; and the commission of a

only advances a drug-related motive.  (Gov't Opp'n at 48–54.)  Of course, proof of a drug-related motive for a killing fully satisfies the nexus requirement.  *Aguilar*, 585 F.3d at 660.  And, where the Government relies on a drug-related motive to establish the requisite nexus, it "need only prove beyond a reasonable doubt that one motive for the killing . . . was related to the drug conspiracy."  *Aguilar*, 585 F.3d at 659.  Put differently, "the government has no burden to establish that a drug-related motive was the sole purpose, the primary purpose, or even that it was equally as important as any non-drug-related purpose, as long as it was one purpose" for the killing.  *Desinor*, 525 F.3d at 202.  That said, it is axiomatic that in the absence of sufficient proof of any motive—here, a drug-related motive—the charge cannot be sustained.  Jordan argues that the Government failed to satisfy the nexus requirement because it did not adduce evidence sufficient to support the conclusion that Jordan had a drug-related motive to kill Mizell.  (Def.'s Mem. at 23, 25–26).  The Court agrees.

The Government maintains that Jordan had at least one of a number of drug related motives.  Namely, according to the Government, Jordan was motivated to participate in the killing of Mizell:  (1) as retaliation against Mizell for harming the conspiracy when he was unable to secure the Baltimore deal with Yakim; (2) to eliminate Mizell as the middleman in the conspiracy, to cut costs or increase his own profits, thereby benefitting the conspiracy; or (3) to steal kilograms of cocaine from Mizell to sell with Washington.[8]  (Gov't Opp'n at 51–54.)

___

violent act by the defendant for the purpose of maintaining or increasing his position in the enterprise or the receipt of anything of value.  18 U.S.C. § 1959(a).  As the Government points out, neither § 848(e) nor § 924(j) contain any such elements.  (Gov't Opp'n at 47, n.22.)  As such, Jordan's reliance on the standard applicable to 18 U.S.C. § 1959 is misplaced.

[8] Perhaps tellingly, at trial, the Government did not argue expressly the existence of any of these three motives.  Instead, in summation, the Government argued only that "[w]hatever the specific motive may have been, it doesn't matter.  They're all related to narcotics, they're all related to the drug conspiracy . . . . Certainly, a cocaine deal worth hundreds of thousands of dollars with the promise of more is enough to get someone killed."  (Tr. 2316:25–2317:8.)

According to the Government, "each of these 'competing inferences' is based on direct and circumstantial evidence . . . sufficient under Section 848(e)." (*Id.* at 54.) The Court is not convinced.

As set forth in the Government's opposition, the trial evidence from which a drug-related motive could be drawn as to Jordan can be summarized, in total, as follows: In 2001 or 2002, Jordan asked "Mizell to establish him as a cocaine distributor,"[9] (Gov't's Opp'n at 50); Mizell gave Jordan an ounce of cocaine to sell, which he successfully sold, (*see id.* at 50–51, 54); Jordan entered a conspiracy with Mizell and Washington to distribute ten kilograms of cocaine in Baltimore, (*id.* at 51); the Baltimore deal would have been lucrative, (*id.* at 51); Jordan and Washington spent time together inside and outside of the Studio, (*id.* at 51); and Jordan and Washington met up after Mizell's murder, (*id.* at 50). The Government adduces nothing further on this point.[10] While this evidence establishes that Jordan agreed to sell cocaine on behalf of Mizell and was friendly with Washington, as discussed *infra*, its reach does not extend to the motives advanced by the Government.

The principal motive pressed by the Government is retaliation by Jordan for Mizell's failure to consummate the Baltimore deal with Yakim, resulting from Yakim's refusal to work with Washington. But, by the Government's own account, "there was no trial testimony or physical evidence that Jordan's role in the narcotics conspiracy was dependent on Washington's

---

[9] Interestingly, although the government notes that Jordan asked Mizell to "put [him] on" and "begged Mizell to help establish him as a cocaine distributor," (Gov't's Opp'n at 18, 52), the Government later described Jordan as more experienced than Mizell at selling cocaine, (*see* Gov't's Opp'n at 54).

[10] In its opposition, the Government highlights further evidence that related exclusively to Washington or was otherwise unconnected to Jordan. For example, the Government highlights that Mizell was scheduled to meet with his supplier in October 2002, and that, in August 2002, Mizell and Washington attended a meeting with Yakim, to consummate the deal to distribute ten kilograms of cocaine in Baltimore, during which Yakim refused to work with Washington. However, there was no evidence that Jordan knew about the meeting between Mizell and his supplier, (*see* Gov't's Opp'n at 50), or about Yakim's refusal to work with Washington, (*id.* at 51–53).

14

role in Baltimore, or preconditioned on the Baltimore deal at all." (Govt's Opp'n at 41.) That is, according to the Government's opposition, "[t]here was an agreement between Mizell and Jordan to sell cocaine, and there was no evidence at trial that Washington's inability to distribute cocaine with Yakim in Baltimore negated Jordan's agreement with Mizell." (*Id.*) To put an even finer point on it, the Government states, "there were no failed negotiations between Mizell and Jordan . . . [and] no evidence that Jordan was told he could not distribute in Baltimore." (*Id.* at 41–42.) True. From what evidence, then, could the jury have reasonably inferred that Jordan sought to retaliate against Mizell for the failure of the Baltimore deal? There was none. In other words, the Government's arguments in opposition to Jordan's motion do complete violence to its claim that Jordan may have been motivated to kill Mizell as a result of the failed or compromised nature of the Baltimore deal.

The gaps in proof pervade each of the remaining purported motives in this case. To be clear, the Court does not question that, in the abstract, each of the advanced motives could serve as a basis to sustain Count One. However, a review of the trial record reveals that the evidence—direct and circumstantial—purportedly supporting these motives is at most "meager." *See Guadagna*, 183 F.3d at 130. For example, with respect to the second motive—that Jordan sought to eliminate Mizell as the middleman in the conspiracy—the Government fails to identify evidence that Jordan was dissatisfied by his portion of revenue from drug sales, was in contact with any supplier, or otherwise made arrangements to carry on Mizell's operation. Certainly, there is evidence establishing that Mizell functioned as the conspiracy's middleman. (Tr. 885:3–17, 1751:17–20, 1752:2–12). However, that fact, alone, cannot support an inference that Jordan was motivated to consolidate the conspiracy's operations or spearhead an increase in his or the conspiracy's profits. Moreover, with respect to the third motive—that Jordan sought to steal

15

kilograms of cocaine from Mizell—the Government fails to point to any evidence that Jordan

knew about the scheduled meeting between Mizell and his supplier, knew that there would be

kilograms of cocaine at the Studio, or made arrangements to distribute any additional cocaine

himself.  Incredibly, the Government does not identify a single specific record cite in support of

these advanced motives.  To draw the conclusions urged by the Government would exceed the

bounds of reason and require plainly impermissible speculation.  *See United States v. Pinckney,*

85 F.3d 4, 7 (2d Cir.1996).

This is not to say that there could be no case where a drug-related motive is found despite

"holes in the Government's proof of motive."  *E.g.*, *United States v. Glenn,* 312 F.3d 58, 65 (2d

Cir. 2002).  The Government cites to a number of them.  This Court has mined those cases and

finds them plainly distinguishable.  In each, there was sufficient evidence from which a drug-

related motive could be reasonably inferred.  The difference between the level of proof present in

those cases compared to the one at bar is stark.

For example, the Government refers the Court to *United States v. Glenn*, 312 F.3d 58 (2d

Cir. 2002).  In *Glenn*, the court found that the Government presented sufficient evidence that the

defendant was motivated to kill his co-conspirator because the co-conspirator cheated him out of

his share of stolen drugs.  312 F.3d at 65.  Namely, the court highlighted that the defendant was

aware of the quantity of the stolen drugs, encouraged his co-conspirator to steal the drugs, visited

his co-conspirator twice to obtain his share of the stolen drugs, and that the co-conspirator lied

about the amount he stole and refused to give the defendant a share based on actual proceeds.  *Id.*

The *Glenn* court concluded that, although there were some "holes in the Government's proof of

motive," the evidence presented was sufficient for a jury to find that the defendant murdered his

co-conspirator because he lied about the robbery proceeds, and the defendant's portion of the

16

drugs was "unacceptably small." *Id.*  In this case, there is simply no evidence suggesting that

Jordan felt cheated by the failure of the Baltimore deal, was disappointed by the proceeds he

received from the conspiracy, or sought to steal cocaine from Mizell, much less motivated to kill

Mizell because of these reasons.

The Government's reliance on *United States v. Campbell*, 850 F. App'x 102 (2d Cir.

2021), is similarly unhelpful.  In pointing to *Campbell*, the Government notes that the court

found that evidence that the defendant was involved in a drug conspiracy, participated in the

murder, and met with co-conspirators after the murder, as well as the timing of the murder

relative to drug activity, was sufficient to support a finding of nexus.  (Govt's Opp'n at 51.)  But,

what the Government fails to acknowledge is that the court's finding also relied on evidence that:

the defendant caught the murder victim attempting to steal marijuana from the stash house; co-

defendants immediately relayed the murder victim's whereabouts to the defendant whenever

they spotted him; the defendant committed the murder approximately two weeks after the victim

attempted robbery; and after the murder, the defendant and co-defendants fled the neighborhood

together with a duffle bag containing, among other things, a distribution quantity of marijuana,

paraphernalia used for marijuana distribution, and the three kinds of ammunition used in the

murder.  *United States v. Peter*, No. 17 CR 054, 2019 WL 2918226, at *15–17 (S.D.N.Y. July 8,

2019), *aff'd sub nom. Campbell*, 850 F. App'x 102.  It was only in the face of all of this evidence

that the Court found that "[t]he obvious link between [the attempted marijuana robbery and the

murder] was laid bare for the jury: days after [the defendant] caught [the murder victim]

attempting the robbery, [co-defendants] . . . joined up with [the defendant] to stalk and execute

him." *Id.* at *15.  The record in this case is bereft of such an "obvious link," or any link, between

17

the failed Baltimore deal and Jordan's decision to participate in Mizell's murder two months later.[11]

The Government's reliance on *United States v. Gracesqui*, No. 10-CR-74, 2016 WL 11259074 (S.D.N.Y. June 3, 2016), *aff'd*, 730 F. App'x 25 (2d Cir. 2018), and *United States v. Acosta*, 833 F. App'x 856 (2d Cir. 2020), is likewise misplaced. In *Gracesqui*, the court found the evidence sufficient for the jury to infer that the charged murder was intended to "make[e] an example of the person who robbed [the defendant's co-defendant] of heroin." No. 10-CR-74, 2016 WL 11259074, at *5. But, critical to the court's conclusion was testimony that the defendant was expressly told that "[his co-defendant] wanted them to kill the guy who stole [the co-defendant's] drugs." *Id.* In *Acosta*, the court found that there was "compelling evidence that the motive for the murders was to seek revenge on those responsible for the burglary of [the defendant's] stash house." 833 F. App'x at 862. There, the Government proved that two of the defendant's workers stole roughly $200,000 in drug proceeds from one of his stash houses and that the defendant subsequently sought the help of a family friend specifically to kill the workers for the theft of the drug proceeds. *Id.* There is no such evidence here.

The Government relies on *United States v. Santiago-Ortiz*, No. 17-CR-0149, 2018 WL 4054859 (S.D.N.Y. Aug. 23, 2018), *aff'd*, 797 F. App'x 34 (2d Cir. 2019), where the court found that the jury could reasonably infer that the defendant, a member of a drug organization, murdered the victim because he felt disrespected by a personal dispute and was motivated to bolster his reputation within the organization. No. 17-CR-0149, 2018 WL 4054859, at *5.

---

[11] In support of its purported motives, the Government relies in part on the fact that "Jordan and Washington met up together after the murder." (Gov't's Opp'n at 50.) However, the Government fails to state is that this meeting occurred over a month after Mizell's murder. (*See* Tr. 1527:18–1528:12.) In *Campbell*, the court found evidence that defendant met with co-conspirators immediately following the murder to be probative of nexus. This fact is hardly analogous to the present case.

There, the Government proved that: the victim got into a physical altercation with the defendant's brother, who was also a member of the organization; when the defendant encountered the victim several months later at a pool hall, the defendant left the premises and returned with his drug supplier before shooting the victim; and the defendant was elevated to sole drug distributor because of the respect he commanded within the organization following the murder. *Id.* at *3. In this case, there is simply no evidence of a personal dispute between Jordan and Mizell, or any suggestion that Jordan felt slighted by his role in the conspiracy. Nor is there any evidence that Mizell's murder resulted in Jordan's promotion within the conspiracy.

The Government also refers the Court to *United States v. Santos*, 541 F.3d 63 (2d Cir. 2008), for the proposition that the murder itself can "assist in proving the substantive connection between the narcotics conspiracy and the murder." (Gov't's Opp'n at 55.) While that may be true, the evidence of the murder itself must be accompanied by other evidence supporting the requisite nexus. *Santos* is instructive here. In *Santos*, in addition to the murder itself, the court found that there was additional evidence from which the jury could reasonably infer that "one motive for the killing was related to [the drug] conspiracy. *Santos*, 541 F.3d at 74. Namely, there was evidence that the defendant asked why he was being hired, to which he was told, "[A] large-scale cocaine dealer . . . wanted two men killed for stealing $316,000." *Santos*, 541 F.3d at 74. No such evidence exists here.[12]

---

[12] The Government's reliance on *United States v. Vernace*, 811 F.3d 609 (2d Cir. 2016) similarly fails. There, the court found that the jury could reasonably infer motive, because as a member of a criminal enterprise, the defendant felt disrespected as a result of a personal dispute that arose at a bar and returned with other members of the enterprise to murder the victims, "to preserv[e] (and even enhanc[e])" the enterprise's reputation." *Vernace*, 811 F.3d at 616. There is no evidence of a personal dispute between Jordan and Mizell. Nor is there any evidence suggesting that Jordan sought to enhance his reputation or that of the conspiracy by participating in the killing of Mizell.

### B.    Count Two

Pursuant to Count Two, Jordan was charged with violating 18 U.S.C. § 924(j), which criminalizes causing the death of a person through the use of a firearm in the course of a violation of Section 924(c).  (Superseding Indictment ¶ 2.)  A violation of Section 924(c), in turn, occurs when "any person who, during and in relation to any . . . drug trafficking crime . . . uses or carries a firearm . . . ."  18 U.S.C. § 924(c)(1)(A).  To prove that a firearm was used during and in relation to the drug trafficking conspiracy, the Government must prove that the firearm was an integral part of the commission of the drug conspiracy and that it furthered or facilitated the crime.  *See United States v. Washington*, 48 F.3d 73, 80 (2d Cir. 1995) ("Section 924(c) applies where possession of a firearm is 'an integral part of the predicate offense and facilitates the commission of that offense." (citations omitted)).  It is not enough for the use of the firearm to be inadvertent, coincidental, or for some purpose other than furthering and facilitating the drug conspiracy.  *See Smith v. United States*, 508 U.S. 223, 227–28 (1993) ("By its terms, [Section 924(c)(1)] requires the prosecution to make two showings.  First, the prosecution must demonstrate that the defendant used or carried a firearm.  Second, it must prove that the use or carrying was during and in relation to a crime of violence or drug trafficking crime." (internal quotation marks omitted) (alterations accepted)).  "[T]he ultimate question is whether the firearm afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking."  *United States v. Snow*, 462 F.3d 55, 62 (2d Cir. 2006) (citing *United States v. Lewter*, 402 F.3d 319, 322 (2d Cir. 2005)) (internal quotation marks omitted).

The Government maintains that "the same evidence outlined . . . in connection with the narcotics conspiracy provided a sufficient basis for the jury to rationally find that . . . Jordan used

20

firearms during and in relation to the narcotics conspiracy at the time of Mizell's murder." (Gov't's Opp'n at 58.)  That is, "[a]ll of the motives previously described 'afforded some advantage' . . . . to the narcotics conspiracy . . . ." (*Id.*)  The Court has already found that the Government's purported motives underlying Count One to be insufficient.  The Court's reading of that evidence is no different when viewed through the lens of Count Two.

*    *    *

"While it is true that a conviction may be based solely on reasonable inferences from circumstantial evidence, a conviction cannot rest on mere speculation or conjecture." *Pinckney,* 85 F.3d at 7 (citations omitted).  "In particular, the government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir.1994).  Here, after a review of the trial record, the Court finds that the Government's theories of Jordan's drug-related motive to kill Mizell or drug offense-related motive to use a firearm are impermissibly speculative and just conjecture.  Jordan has met the heavy burden that Rule 29 demands to be granted a judgment of acquittal on Count One and Count Two.

## II.    Rule 33:  Motion for a New Trial[13]

Under Rule 33 of the Federal Rules of Criminal Procedure, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a). Rule 33, by its terms, gives the trial court "broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992); *see also United States v. Robinson*, 430 F.3d 537, 543 (2d Cir. 2005). Indeed, a "trial court has broader discretion to grant a new trial under Rule 33 than to grant a

---

[13] Under Rule 29(d), "[i]f the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted."  Fed. R. Crim. P. 29(d).

motion for acquittal under Rule 29 . . . . " *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *Sanchez*, 969 F.2d at 1414).  Notwithstanding, a trial court "must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'"  *Id.* (quoting *Sanchez*, 969 F.2d at 1414).

"In evaluating a Rule 33 motion, the court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation, keeping in mind that the ultimate test for such a motion is whether letting a guilty verdict stand would be a manifest injustice."  *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018).  Importantly, the court "must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurp[ing] the role of the jury," which is tasked with resolving conflicting evidence and assessing witness credibility.  *Ferguson*, 246 F.3d at 133 (citations and quotation marks omitted); *United States v. Landesman*, 17 F.4th 298, 330 (2d Cir. 2021).  Thus, "a district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand."  *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020).  That is, "under [Rule 33], a district court may not 'reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.'"  *Id.*  Only in "exceptional circumstances"—where, for example, "the evidence was patently incredible or defie[s] physical realities," or in a case where, for example, "an evidentiary or instructional error compromised the reliability of the verdict" or "the government's case depend[ed] upon strained inferences drawn from uncorroborated testimony"—should a court grant a new trial.  *Id.*; *Landesman*, 17 F.4th at 331; *see also Ferguson*, 246 F.3d at 133–34 ("It is only where exceptional circumstances can be

22

demonstrated that the trial judge may intrude upon the jury function of credibility assessment [under Rule 33]." (internal quotation marks omitted) (citing *Sanchez*, 969 F.2d at 1414)).

### A.    Alternative Perpetrator

Jordan maintains that he is entitled to relief under Rule 33 because, according to Jordan, there was "uncontested evidence" that "Jay Bryant, not Jordan, shot Mizell." (Def.'s Mem. at 29.)  Specifically, Jordan directs the court to the testimony of Raymond Bryant, Jay Bryant's uncle. (*Id.* at 29–30.)  Therein, the elder Bryant testified that, on two occasions—once in 2003 or 2004 and again in 2016—Bryant confessed to killing Mizell.[14]  On the first occasion, Bryant

---

[14] At trial, the following testimony was elicited from Raymond Bryant:

> Q[:]  Do you recall anything else about that conversation [with Jay Bryant]?
> A[:]  That he wouldn't have did it if he didn't go for his gun . . . .
> Q[:]  Who are the "he's" in your sentence?
> THE COURT:  Who are you saying went for their gun?
> THE WITNESS:  Jam Master Jay . . . .
> THE COURT:  And when you said. [h]e wouldn't have done it, who was it – who wouldn't' have done it?
> THE WITNESS:  Jay.

Tr. 1374:19–1375:2.

> Q[:]  And the first time that Jay Bryant told you he killed [Mizel] was in 2003, 2004; isn't that correct?
> A[:]  Yes . . . .
> Q[:]  And as far as you can recall, you were the only one present when this conversation took place?
> A[:]  Well, we were talking on the side.
> Q[:]  But her was talking to you, correct?
> A[:]  Yes, yes.
> Q[:]  He was confiding to you, correct?
> A[:]  Yes.
> Q[:]  And he told you, he did it, right?
> A[:]  Yes.

*Id.* at 1377:8–25.

> Q[:]  And then you had a subsequent conversation around 2016, about maybe five years ago, correct?
> A[:]  Yeah, give or take.
> Q[:]  And this is after the – a hat was found or he told you about a hat –
> A[:]  Right.
> Q[:]  – that had been found at the murder scene that had DNA on it, correct?
> A[:]  Yes.

23

admitted that he "did it" because Mizell went for his gun. (*Id.* at 1374:15–1375:2.) On the second occasion, Bryant relayed that his hat, containing his DNA, had been found at the crime scene. (*Id.* at 1378:10–21.) Jordan highlights that Raymond Bryant's testimony is corroborated by the presence of Jay Bryant's DNA at the crime scene and testimony that an individual matching Jay Bryant's description entered the building shortly before and after the shooting. (Def.'s Mem. at 29–31.) Jordan further underscores that the eyewitnesses consistently testified that there was only a single shooter in the Studio. (*Id.* at 31.)

On these facts, the Court could find the conclusion that Jay Bryant was the shooter, not Jordan, to be reasonable—even more reasonable.[15] But, Rule 33 requires more. The Court's misgivings do not render the evidence supporting Jordan's conviction "patently incredible," in "defi[ance of] physical realities," or the result of "evidentiary or instructional error [that] compromised the reliability of the verdict." *See Archer*, 977 F.3d at 188. And, of course it remains the jury's role, not the Court's to weigh conflicting evidence. Although Jordan highlights Bryant's presence at the scene at the time of the shooting, this fact is not inconsistent with the Government's theory that Jay Bryant conspired with Jordan and Washington to murder Mizell. According to the Government's theory, Jay Bryant's role in the conspiracy was to open

---

Q[:]  And he said it was his hat that was at the murder scene, correct?
A[:]  Yes.

*Id.* at 1378:10–21.

[15] The Court's view in this regard is reinforced by a number of facts. Lydia High reported on the night of the murder that the shooter was "tall." (Tr. 1004:11–20.) As even the Government notes, Jordan is only 5'9" tall, while Jay Bryant stands at a towering 6'4" or 6'5". (*Id.* at 2022:15–18, 2326:17–19.) Moreover, while Jay Bryant's DNA was found on the hat at the crime scene, (*id.* at 190:7–24, 192:14–193:19, 408:21–410:17), and although the Government argued that Jordan perhaps borrowed that hat from Bryant, (*id.* at 2331:10–12), Jordan's DNA was not found on the hat, (*id.* at 444:2–446:9)—only Bryant's. It is true that High testified that the shooter had a tattoo on his neck. (*Id.* at 958:4–13.) However, there was no evidence that, on the night of Mizell's murder, High included the neck tattoo in her description of the shooter to law enforcement.

the rear door of the building to grant Jordan and Washington entry.[16]  The evidence adduced at trial provides support for this theory.  At trial, Tanya Davis, another occupant of the building in which the Studio was located, testified that shortly before Mizell was shot, she observed Jay Bryant enter the building behind Lydia High and walk in the direction of the Studio and towards the building's back door.  (*See* Tr. 1311:23–1315:1.)  Shortly thereafter, she observed Jay Bryant return from the direction of the back door towards the front exit of the building.  (*See id.* at 1317:7–1318:10.)

It is true that there was also trial evidence indicating that Jay Bryant confessed to Mizell's murder to his uncle, Raymond Bryant.  Specifically, Raymond Bryant testified that Jay Bryant "basically told [him] that he was involved [in Mizell's murder] . . . [and] he did it," (*Id.* at 1352:24, 1353:1; *see also id.* at 1377:8–1378:2), and that he "said he would not have killed Jason Mizell if Jason Mizell didn't reach for a gun," (*id.* at 1378:3–6).  However, the jury also heard testimony from Uriel "Tony" Rincon, a victim of the shooting.  Specifically, Rincon, who had a previous relationship with Jordan, testified that he had no doubt that Jordan was the shooter. (*See id.* at 592:16–18 (Q[:]  As you sit here, sir, is there any doubt that Karl Jordan shot Jason Mizell? A[:]  No.").)[17]  Lydia High also testified that the shooter was a "fair-skinned" Black man with a neck tattoo.  (*Id.* at 958:6–13.)  Jordan has a neck tattoo.  (*Id.* at 685:11–16.) Additionally, Cherubin Bastien testified that while driving Jordan and his friends around in 2004, he overhead a conversation about Jam Master Jay, in which Jordan stated, "if I get to kill him,

---

[16] The Court presumes that the jury resolved any conflict that may have emerged from the fact that both Jordan and Washington had ready access to the studio and, according to eyewitness testimony, the perpetrators made no effort to conceal themselves; begging the question why Bryant, who was unknown to Mizell and had to sneak into the building behind Lydia High, would be given this role.

[17] Although Rincon did not initially identify Jordan as the shooter, he explained at trial that he hid the truth because he was weary of retaliation.  (*Id.* at 525–65.)  The jury clearly credited Rincon's testimony over that of Raymond Bryant.

I'll kill him again." (*Id.* at1845:25–1846:14.) Bastien also recalled another conversation in which, while arguing with a woman, Jordan told the woman that he would "do [her] exactly just like him," referring to Mizell. (*Id.* at 1847:16–1848:3.) Moreover, as the Government points out, the presence of Jay Bryant's DNA[18] at the crime scene was also "put before the jury for their consideration." (Gov't's Opp'n at 64.) As evinced by the verdict, it is plain that the jury resolved the presence of Bryant's DNA and the absence of Jordan's DNA at the crime scene and was unpersuaded by the Defense.

### B.    Juror Misconduct

As a separate basis for granting a new trial, Jordan argues that Juror No. 12 was impaired. (Def.'s Mem at 34.) By way of background, after jury deliberations began, the foreperson submitted a note indicating that Juror No. 12 asked to be excused, as "he felt like he [was] too connected being that he work[ed] in Hollis, Queens, and he [was] a regular in the barber shop." (Tr. 2600:7–10.) Shortly thereafter, with defense counsel present, the Court conducted an in-camera discussion with Juror No. 12 about his concerns. (*Id.* at 2606–07; 2615–20.) During this discussion, the juror expressed that he had frequented a barbershop near the crime scene and felt "very uncomfortable" because "generally someone in the Hollis area" could identify him. (*Id.* at 2616–2619.) Outside the presence of Juror No. 12, the Court heard from the parties. Counsel for Washington expressed that the juror's concern about potential recognition was unremarkable, as it could be held by any juror. (*Id.* at 2620:22–25.) Counsel for Jordan did not offer a separate position, and the Government noted that it would not "force the issue" if "both defendant counsel

---

[18] It is true that the DNA evidence retrieved from Bryant's hat was before the jury at trial suggesting that, here, too, it resolved conflicting evidence related thereto. Perhaps the jury was swayed to explain away the evidence by the Government's highly speculative, but unobjected to, argument at closing that "[m]aybe Karl Jordan Junior had it in his pocket and it fell out when he pulled out the 40-caliber pistol he used to kill Jason Mizell." (*Id.* at 2331:10–12.) Based on the evidence adduced at trial, that conclusion would necessarily require the jury to make a factual leap, not reasonable inference.

[did]n't want a more searching inquiry," although the juror "seem[ed] uncomfortable." (*Id.* at 2623:6–8.)

Having found an "agreement amongst counsel that what [Juror No. 12] articulated [was not] a basis to have him excused," as "the law does not require that jurors have no familiarity with the places that are at issue," the Court brought the juror back in-camera and explained that he would not be excused. (*Id.* at 2616:6–7; 2623:23–25; 2626:2–7.) The Court also reminded Juror No. 12 that the jury was and would remain anonymous and reiterated the juror's obligation to deliberate fairly and impartially. (*Id. at* 2626:8–15.) The juror confirmed his understanding but went on to state that his jury service in a state murder case in 2004 had prompted him to raise concerns in the instant case. (*Id.* at 2626:16; 2626:18–19; 2626:21–22.) Specifically, Juror No. 12 explained that in the prior case a witness was shot "after [he] came back to the neighborhood," which he concluded demonstrated the fundamental nature of "these people." (*Id.* at 2627:1–8; *see id.* at 2629:20–22.) The Court reminded Juror No. 12 that he had previously been questioned about prior jury service and whether it would affect his ability to be impartial. (*Id.* at 2629:25–2630:8.) In response, Juror No. 12 stated, "I'm just saying the experience of what happened." (*Id.* at 2630:9–10.) Ultimately, the Court found concerning Juror No. 12's use of the phrase "these people" when expressing his safety concerns. (*Id.* at 2632:16–18, 2634:23–2635:1.) Juror No. 12 assured the Court that he could be fair and impartial. (*See id.* at 2626:2–15 ("[Juror No. 12] explained to [his] fellow jurors that [he] can have an open mind.").) Nonetheless, the Court excused Juror No. 12. (*Id.* at 2636–2637). The jurors were subsequently informed that they should not be concerned with the Juror No. 12's excusal. (*See id.* at 2638.)

It is against this backdrop that Jordan argues that Juror No. 12 falsely and deliberately indicated on the jury questionnaire that he could be fair and impartial. (Def.'s Mem at 37–38.)

In other words, Jordan attempts to characterize Juror No. 12's late-stage expression of unease arising from his prior jury service as an issue of intentional nondisclosure triggering entitlement to a new trial. (*Id.*) It is not.

In *McDonough Power Equipment, Inc. v. Greenwood*, the Supreme Court explained that "to obtain a new trial in . . . a situation [involving a juror's failure to disclose], a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." 464 U.S. 548, 556 (1984). Importantly, the Supreme Court made plain that a good faith, yet mistaken, response is insufficient to warrant a new trial. *Id.* at 555 (finding that "[t]o invalidate the result of a 3-week trial because of a juror's mistaken, though honest, response to a question, is to insist on something closer to perfection than our judicial system can be expected to give" and "contrary to the practical necessities of judicial management").

Here, the questionnaire asked only one question about a potential juror's prior jury service: whether his or her prior jury service would impact his or her ability to be fair and impartial. (Tr. 2629:24–2630:3.) While Juror No. 12 described a confluence of factors that made him uncomfortable during deliberations (*e.g.*, familiarity with the Hollis area; concern about "these people"; an apparent reference to drug traffickers; generalized safety concerns; and the witness in the prior case being killed), he maintained that he, nevertheless, could be fair and impartial. (*See id.* at 2626:2–16.) That is, even in the midst of misgivings regarding his safety, Juror No. 12 conveyed his belief that he could faithfully and impartially discharge his duties. There is nothing in the record to suggest that Juror No. 12 had been duplicitous or anything other than candid. That the Court had misgivings because of Juror No. 12's reference to "these people" does not alter the Court's conclusion. And, even if Juror No. 12 overestimated his

28

ability to be fair and impartial as a result of his prior jury experience, it amounts to nothing more than a mistake.  By Jordan's logic, any juror's overestimation of their ability to remain impartial would amount to misconduct.  That would lead to an absurd result.  As the Supreme Court put it, "[t]o invalidate the result of a [six]-week trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give."  *McDonough*, 464 U.S. at 555.

## CONCLUSION

For the foregoing reasons, Jordan's motion for a judgment of acquittal is GRANTED, and Jordan's motion for a new trial is conditionally DENIED.


SO ORDERED.


Dated: Brooklyn, New York                    /s/ LDH
      December 19, 2025                    LASHANN DEARCY HALL
                                        United States District Judge